Good morning, may it please the Court. My name is David Schlesinger. I represent the petitioner, Herring Broadcasting, Inc., doing business as WEALTH TV. I'm joined at council table by Kathleen Wallman, who is WEALTH TV's lead hearing counsel before the FCC. And in the front row of the gallery are Charles and Robert Herring Sr., who are the co-founders of WEALTH TV, which is a family-owned, independent, non-affiliated national cable television network. As we enunciated in the introduction to our opening brief and reiterate again today, this is a case that in 2009, when it was tried before the FCC in a hearing, was litigated against such poorly defined standards and procedures that an Administrative Procedure Act violation was almost inevitable to occur, and we submit did occur, in two key respects. Actually, three key respects, if you want to turn to the evidentiary issues at play. The first such issue that I'd like to discuss, and this will be slightly out of order, given the way it was addressed in the opening brief, is the similarly situated analysis that the ALJ and the FCC commissioners conducted. Regarding Time Warner Cable's expert, Mr. Michael Egan, Mr. Egan's methodology not only was in adopting Mr. Egan's analysis, it was not only an arbitrary and capricious decision to rely on his book-and-feel analysis of WEALTH TV and the Interveners Affiliated Network, MOJO, that fails under the D.C. Circuit's decision in Central Florida Enterprise. That was hardly the heart of either the ALJ's or the FCC's analysis, though. It was the difference in the target demographics and the difference in the type of programs the networks carried, right? We acknowledge, Your Honor, that it was part of the analysis to look at the target audience, the supposed target audience of WEALTH TV versus the supposed actual audience. We quibble with the FCC's analysis in that regard because we don't think that it properly apprehended the difference between a target audience and an actual audience, which can have appeal that goes well beyond the target demo. But even assuming that, which we don't, but even assuming for purposes of this case that that analysis stands, Egan's look-and-feel methodology was explicitly adopted by both the ALJ and the FCC. We have no idea how much the FCC actually relied on that analysis in making its determination regarding similarly situated. In addition, Your Honor, besides look-and-feel, there were serious problems regarding Mr. Egan's analysis of the subgenres, the supposed subgenres of WEALTH TV and Mojo. In Tennis Channel, the Comcast Communications, which succeeded our case, the FCC explicitly noted that Mr. Egan's subgenre analysis was neither accepted in the industry nor one that it could accept as a means of determining whether the networks were similarly situated. That's not the analysis that he applied in your case. He didn't apply a subgenre analysis. We would actually argue, Your Honor, that he did apply a subgenre analysis. The record is devoid of any indication that Mr. Egan ever gave an overall categorization of either WEALTH TV or Mojo. We submit also that if you parse the record very carefully, you'll see that Mr. Egan went straight to looking at the programs that aired on the networks and then categorized those programs within subcategories. Sports, music, movies, those strike me as pretty well-defined genres. They're not subgenres of something. Those are subgenres, Your Honor, but as- I'm saying they're not subgenres. Sports, movies, music, those are genres in and of themselves. Well, when you look at the FCC's analysis in Tennis Channel, it defines genre much more broadly. It looked at the networks- You're talking about sports, and then you try to do a subgenre. Well, we got tennis versus golf. Right, and- But sports is the genre. Right. And that's what was applied here. Well, we would disagree with that, Your Honor. We think that step A, which occurred in Tennis Channel, which was to define it as sport and then move on to the subgenre, which the FCC then rejected, was never adhered to here. WEALTH TV has consistently advocated for a genre classification as a lifestyle network, and that's a classification that even Robert Wilson, who's the Senior Programming Executive for Cox Communication, in paragraphs 138 to 140 of his written testimony, noted that Mojo and NHD were. So- The difficulty that I have with this lifestyle genre, and maybe you can help me understand this, is unlike sports, I think it's so broad. I mean, you have, you know, so many- Lifestyle is just, you know, it's like saying human species. You know, it's just so broad. So isn't the subgenre analysis appropriate then when you have such a broad genre? For simplicity, when Judge Walker says, you know, music, sports- We note, Your Honor, that the FCC has diverged in its approach on this issue. In our case, it endorsed Mr. Egan's move to step B of the analysis, the subgenre analysis. In Tennis Channel, it said that the broad genre categorization of sports was sufficient to show, in significant part, that the networks were similarly situated. In our most recent 20HA letter, we noted a Media Bureau decision, a hearing designation order, in Game Show Network v. Cablevision, in which the Media Bureau went so far as to suggest that the Game Show Network was part of a broad genre classification with two networks, WE TV and, I believe, the Wedding Channel, that have a very heavily skewed female audience and really, on their face, don't seem to have any connection to the Game Show Network. But nevertheless, the Media Bureau believed that they were all part of the same broad genre. So our view is, as the D.C. Circuit held in Comcast v. FCC, which is cited in the FCC's brief, that the same policies and standards in evaluating the genre classification need to be applied to similarly situated parties and similarly situated cases. We think that there's been a failure here by the FCC to conduct consistent genre analyses. And so, as a result... I just don't... that doesn't register with me, because Mr. Egan himself testified in that second case, the Tennis Channel case, that the mode of analysis he was attempting to conduct in that case was very different from the mode of analysis he had gone through in this case. And he recognized that, really, I'm kind of going out on a limb in this new analysis that I'm offering. But there was no inconsistency in the FCC's ruling in your case versus that case, as I see it. I understand that that's what Mr. Egan said, Your Honor. And I would just have to respectively disagree with his categorization and any attempt the FCC may have made to distinguish Tennis Channel from this case. I think the old adage that if something looks like a duck and quacks like a duck and walks like a duck, it probably is a duck. And I think when you parse these respective methodologies used in the different cases, it was almost exactly the same. And it bears emphasizing, again, that Mr. Egan himself recognized that this was not an industry-accepted method of categorizing networks for genre purposes when determining whether to carry them. And, additionally, that he did not use the accepted genre classifications that Tribune Media Services, which is an accepted media industry leader, in providing genre classifications. He did not use the TMS official classifications. This was an analysis that he essentially created from scratch. So moving on to burden shifting. This is an area, again, that the FCC has admitted in footnote 50 of its opinion in our case that needs clarification in the program carriage area. I think the facts of this case demonstrate amply why burden shifting is needed and should have been required in the Section 616, Section 536 under the U.S. Code analysis. But the FCC ultimately concluded that it wouldn't have mattered which party bore the burden. So why would we need to resolve that issue to decide this case? And I know, Your Honor, that the FCC did have some conclusory language in its opinion indicating that it wouldn't have made a difference anyway. We note, first, that there wasn't any detailed analysis indicating that the FCC had meaningfully considered the differential treatment between WEAL-TV and Mojo. And, second, that if it had, it would have seemed that there was such a stark differential, when you apply the various factors that we've discussed in our brief, such a stark application of these supposedly neutral, non-discriminatory business purposes, that if this case were to have arisen in a civil action in a federal district court under Title VII or an analogous statute, I think this Court would, regardless of whether it arose in a Rule 56 context or following a bench trial, I think it would essentially want a district court on remand to do it again, that there was no meaningful analysis of the differential factors and how they may have actually suggested that the proper reasons that the interveners gave for not carrying WEAL-TV were pretextual. Well, I mean, I guess I see. Tell me if I'm looking at the case wrong in terms of this burden-shifting issue. I just see it as it really comes down to whether the FCC correctly or reasonably determined that these two networks were not similarly situated. And if we conclude that the FCC was right on that point, right, then it seems to me it doesn't matter. They determined that it wouldn't have affected the outcome who had the initial burden. And we do acknowledge, Your Honor, that it is a threshold consideration. We also note that under the 2011 program carriage rules that the FCC has promulgated, they are slowly but surely rolling out rules in this area. Similarly situated, unlike in our case, is actually defined with a series of non-exclusive factors. We believe, as articulated in our briefs and as I've just discussed, that the similarly situated analysis that occurred in this case under ill-defined guidelines using an arbitrary subjective look and feel determination in a sub-genre analysis that was not industry accepted and was not accepted by the FCC and Tennis Channel, a similarly situated case, that even on that threshold question, the APA was violated. And then this Court would then either look to burden shifting and rule on that issue or determine simply that because the APA violation on similarly situated was so serious and because under the 2011 program carriage rules, similarly situated plus differential treatment is a mode of proving discrimination under Section 616, then there is a need to remand this case for further proceedings just to clarify everything. I note that I have a few minutes before I'd like to reserve, but I'd like to try to reserve about three or four minutes. But let me quickly move to what I think is the most important of the evidentiary issues that we've raised, which is the FCC and ALJ's preclusion of clear admission by Steve Burke, who was then the chief operating officer, the number two person at Comcast, that Comcast treated its affiliated networks as siblings. Tell me if I'm reading your brief correctly. I came away thinking that you suggested that that error alone, assuming we found it to be error, would not in and of itself require reversal. Am I reading your brief correctly? We acknowledge that, Your Honor. But we think that linked with an APA violation regarding similarly situated, given the need on remand to prove differential treatment or to prove intentional discrimination, and this is, we submit a clear instance, a rare instance, where a very high-ranking corporate executive admitted to giving preferential treatment to its own affiliated networks. And in Tennant's channel, the FCC thought this was such a significant piece of evidence that it used it almost standing alone to find that Comcast systematically discriminated in favor of its affiliated networks. I mean, I'm with you that it seemed like it was error to keep it out here, but that's why I was asking you if we don't find an APA violation or we don't find error on any of the other arguments you've raised, you're conceding that this error alone would not require sending it back. We're content to acknowledge and accept the similarly situated threshold, Your Honor. As we've argued repeatedly in our briefs and today, we think that that alone was a serious enough violation that, coupled with the Burke admission being precluded, that there's a need for a new hearing. I shouldn't say a new hearing. I'd say new proceedings. The record could be slightly opened to allow Burke's admission to come in. And we also think that analogous in the administrative context and in a separate set of it in immigration proceedings, much like an asylum case when country conditions evolve, we think that it would be appropriate as well to expand the record so that evidence regarding the technological developments that have transpired since 2009 can come in. And that would impact on, for example, the interveners' contention that bandwidth is continuously restricted and that that supposed legitimate business reason was why, among other things, while TV was not carried, we would submit that, and I think the Court can even take judicial notice just from watching on its preferred mode of television, providing that television provision that HD channels have expanded exponentially in the last four years. So if there are no further questions at this time, actually I would briefly just like to mention the Jacobson subpoena issue. Candidly, we don't think that that is as serious of a violation as would occur regarding Mr. Burke, but we do think that if Mr. Jacobson had been allowed to testify, he would have elucidated and expanded upon the media press releases and the various interviews that he had given to trade publications about NHD and about Mojo. So that as well would have allowed us to have explored the precise genre that Mojo was operating in. Am I wrong, and tell me if I'm misunderstanding the record? I thought the ALJ said, look, I'm not going to let that testimony in, because I think you can get to it through some other mechanism. If it turns out that's not the case, come back to me and I'll revisit it. And I understood that your client never went back and said, hey, we do really need this guy's testimony. Am I wrong on that? I note that I would like to reserve the remainder of my time for rebuttal. Addressing your question, Your Honor, there was not an explicit attempt to in any way raise an interlocutory appeal with the commission or to somehow make a further offer of proof. We think that what we originally argued, what Ms. Waldman originally argued during the pre-hearing conference regarding evidentiary issues was sufficient to illustrate that Mr. Jacobson, under the circumstances with Mr. Herring's written testimony having been dramatically scaled back, was necessary to explain the circumstances regarding NHD, the transition to Mojo, and the various public statements that had been made. It was necessary to authenticate those press releases and interviews, which the ALJ otherwise was not willing to consider. Do you want to save your time? I would, Your Honor. Okay. There are no further questions. Thank you very much. Thank you. Good morning, Your Honors. My name is Gray Pash. I'm counsel for the Federal Communications Commission. With me at table is Jay Cohen, who is representing the intervenors supporting the commission this morning, and I've promised him that I will allow him to have five minutes of the respondent's argument time, and I hope to do that. I'm going to get to what has been argued by Mr. Schlesinger this morning, but the one thing I want to emphasize to the court at the outset is that it not lose sight of the fact that the case that's before you today arose out of an adjudicatory hearing that involved a formal hearing, ten days' worth of testimony, 21 witnesses. There were discovery. There were exhibits. There was post-trial briefing. The ALJ wrote, I think, a very good recommended decision that exhaustively canvassed the evidence that was developed in this proceeding, and ordinarily when a case goes to court under those circumstances, you see the petitioner challenging whether the evidence was substantial, whether there was substantial evidence to support the agency's decision, and whether the agency applied the correct legal standard. You will search in vain in the petitioner's brief in this case for any challenge to whether there was substantial evidence to support the agency's conclusion, and I suppose you might be able to turn some of their arguments into a claim that the agency applied the incorrect legal standard, but it's really minor quibbling over bits of evidence in the record. The commission's decision here, contrary to what petitioners argued this morning, contrary to what they argued in the brief, was not a standardless decision. The standard is in the statute. The statute was adopted in 1992, and it was intended to prohibit affiliated-based discrimination by cable companies. We only have cable companies here. The statute talks about MVPDs, Multichannel Video Programming Distributors, which involves satellite operators and the telephone companies that provide cable service. This morning we're only dealing, the complaint only dealt with four cable companies. But the statute sets the standard. The commission conducted a rulemaking proceeding shortly after the statute was adopted in 1993, and it concluded that the nature of these cases are very fact-based, and that it did not want to adopt broadly based rules that whatever rules developed would develop in case-by-case adjudications. And importantly, it also said it did not want to limit aggressive negotiations between the parties when these issues arise. The statute that we involved did not make common carriers out of cable operators. Cable operators are not required to put on any program channel that a program vendor may bring to it. And the statute also did not prohibit cable companies from owning programming channels. I'm sorry to interrupt. You've got a nice flow there, but you've got a limited amount of time. Can you maybe just jump to your opponent's arguments with respect to the mode of analysis, this genre versus sub-genre mode of analysis? Well, there was no sub-genre mode of analysis in this case. The only reason petitioners can bring this up is because they have picked up on the Tennis Channel case. Now, number one, as we pointed out to the Court in a 28-J letter last week responding to Petitioner's letter, an agency does not act arbitrary or capriciously when it is alleged to be inconsistent in a subsequent decision. If there's an inconsistency, we don't think there is, but if there's inconsistency, that's an issue for the Tennis Channel case. That's not an issue for this case. An agency is obligated to be consistent with precedent or explain its difference. It's not obligated to be consistent with what it did, what it's going to do in the future. There's no clairvoyance here. If the Tennis Channel case is inconsistent with the analysis in this case, that's a matter for the Tennis Channel case. But to the merits of the argument, there was no inconsistency. The Tennis Channel case, if we're going to look at that, contained an explanation both as to the Egan testimony and as to the Burke testimony as to why the outcome was different in those cases. As to the Tennis Channel, number one, we're talking about a completely different record. Here we're talking about Wealth TV and its programming and its negotiations with these four cable companies. The Tennis Channel is talking about the Tennis Channel and its negotiations with one cable company involving an entirely different program content. This is where we get to the sub-genre analysis. Keep in mind, we're talking about the same administrative law judge in both these cases. He was able to look at Mr. Egan's testimony in one case and his testimony in another case. In this case, he found it credible and reliable. As long as we're talking about the evidence on similarly situated, I would encourage the court, if it has not already done so or if it has to do it again, to read the ALJ's discussion of the cable company's expert, in this case, Mr. Egan, and Wealth TV's expert, Ms. McGovern. The ALJ said at one point he was shocked at some of her testimony. He found it completely unreliable. By contrast, he found Mr. Egan's testimony credible and reliable. In Tennis Channel, based on a different record, he found just the opposite. He found Mr. Egan had simply gone too far, that the mode of analysis he had used in this case was fine for this case, but it simply didn't apply in the Tennis Channel case. As to the Burke testimony, I think, Your Honor, as you indicated, Wealth TV's conceded that that's not a determinative factor. Even if the commission erred there, it would be harmless error. It certainly does seem like error, though. Well, I don't think it was error, obviously. But this was testimony that Mr. Burke had given in a separate proceeding. The tennis – Wealth TV – Is there some question as to its authenticity? It was not authenticated under the Federal Rules of Evidence. But I'm saying, was there some question as to its authenticity? No, I'm not aware that there was, but the – It was testimony given under oath, right? But it was submitted as a transcript that had not been certified. The Orr case that's cited in our brief, this Court held in very similar circumstances where testimony in a separate proceeding was thought to be admitted, and the Court said it was not certified there and that it had not been authenticated under the Federal Rules of Evidence. The commission has a specific rule that applies the Federal Rules of Evidence to its administrative proceedings. I recognize that this is a technicality, but the entire Federal Rules of Evidence are often made up of technicalities. That's why we have these rules. And as with the Jacobson testimony, as Your Honor pointed out, WEALTH TV had an opportunity in both of those cases. The administrative law judge here said that if WEALTH TV has other arguments to make or wants to attempt to get this testimony in by another method, they're free to do that. And neither in the Burke case nor in the Jacobson case did WEALTH TV make any other attempt to submit this evidence by some other method. For example, with respect to the Burke testimony, they could have attempted to obtain a certified transcript, certified by the Court. They never made an attempt to do that, and yet they continue to argue that this is somehow error in the commission's decision here. And as the one additional point as to the Burke testimony, the commission said that testimony, even if it had been admitted, would have no bearing on this case. I think it may have overstated that a bit or at least used inartful drafting in the sense that that suggested it would not have been relevant. It would have been relevant to this case. The point I think the commission was making is that this one bit of testimony, which spoke about general policy from one of these cable companies that was totally unrelated to WEALTH TV. It had nothing to do with the WEALTH TV complaints. The commission simply said just one bit of circumstantial evidence cannot outweigh the substantial evidence accumulated in this proceeding, which shows that these cable companies did not discriminate on the basis of affiliation against WEALTH TV. And that's all that the commission was saying in that no bearing language. As to the burden shifting issue, WEALTH TV has argued at various points that it's talking about the burden of proof or it's talking about something else. It's finally conceded in its reply brief that it would have the burden of proof, even under its own analysis. So the only thing we're talking about here is the burden of proceeding. And in this case, we have the benefit or the commission had the benefit of looking back. It had all the evidence had been set out. And it said it would have made no difference who had the burden of proceeding here. If the cable companies, if the ALJ, instead of ruling at the beginning of the proceeding that the burden was rested with WEALTH TV, if the ALJ had said at the beginning that the cable companies now have the burden of proceeding with the evidence with the commission having found that the complaint presented a prima facie case, there's no reason to believe the record would look any different. WEALTH TV speculates about how, well, maybe its strategy would have been different. Maybe something different would have happened. We don't know that. And they offer nothing specific to indicate how they were harmed by this. What we do know is that there was a very substantial body of evidence developed in this proceeding, a very detailed analysis by the administrative law judge. And none of that is challenged by these petitioners. The Court has no further questions. I'll cede the rest of my time to Mr. Cohen. Thank you, Your Honor. Mr. Cohen. Thank you, Your Honor. If I could just briefly amplify on some of Mr. Pash's points, maybe from the perspective of trial counsel. And I'm here today on behalf of all four intervenors, the cable companies, but I tried the case for Time Warner Cable below. First, with respect to the issue of the Egan testimony, there was no error with respect to introducing that testimony. But if you apply the substantial evidence standard and you throw out the Egan testimony, which there was no reason to do, you still affirm because, in fact, there were admissions by Mr. Herring himself and by the expert for Wealth TV that the programming was different. So there was ample other evidence in the record, and there was nothing wrong with Mr. Egan's testimony, but there was ample other evidence in the record as to the differences in programming between these networks. Now, the argument, which seems to be a proffered, that Mr. Egan was using a subjective rather than objective standard, the fact that it's subjective, one, doesn't mean it wasn't proper expert testimony, and, two, it hardly lies for Wealth to be arguing that there was a mistake in introducing subjective testimony. Their expert did a subjective analysis. Mr. Governor's testimony. I think the argument is that there isn't really any standard that we could apply in reviewing that, right? Well, I think that there are, and I think the way the case was teed up by Wealth TV, and if you look at the factors that were set forth, there were two pieces of this analysis. Was the programming similar? And Mr. Egan and Ms. McGovern in her concessions looked at the various types of programming. He simply reviewed the programming schedule and said, I see sports and I see movies on the one hand, and I see other kinds of programming on Wealth TV, and then he went on to the look and feel, and there's nothing wrong with that subjective testimony. And, two, the issue was, as framed by Wealth TV in their complaint, did they target the same audience? What we hear today was that the commission was focused on the delivered audience rather than the target audience. That's not the record, Your Honor. The record, and it comes directly out of admissions from Wealth TV's president and from Wealth TV's documents, is that they were, in fact, targeting a much broader audience. Mojo was targeting men 25 to 49. What the substantial evidence shows is that Wealth was targeting, forget who watched the network, targeting a much broader analysis. It was in the competitive sets. It set forth an affiliation agreements that are under seal. So there's ample evidence with respect to the similarly situated question so that even if you were inclined to accept the attack on Egan, which there was no reason to accept, there's ample evidence to support this. How do we know how much weight the commission gave to this subjective look and feel? And I'm not sure Your Honor has to resolve that for the purpose of this appeal. I don't think for a substantial evidence question, if there's substantial other evidence to support the opinion, and the ALJ cited it and the FCC cited it, I don't think that it was incumbent upon the commission to calibrate how much weight it gave to each piece of this evidence. So I think that issue really has no bearing on the appeal. With respect to burden shifting, just to follow up on something that Mr. Pash said, with respect to burden shifting, what has not been said today and has not been said in the briefs filed by Wealth is what difference would it have made? This record has 15 witnesses who testified on behalf of the cable companies who testified to their non-discriminatory reasons based on affiliation for not giving carriage to Wealth. So if the burden had been placed at the outset on the cable operators, it's discharged by the evidence in this record. I mean in a McDonnell-Douglas burden shifting, the only issue is does the burden of persuasion move to cable companies? And you can look at the ALJ's decision and you can look at the FCC's decision  from each of the four cable operators as to what the commission found to be legitimate business reasons. That would have discharged any burden. Plus, we have the benefit, as Mr. Pash said, of the commission looking with hindsight. Now, ordinarily, if this were a jury trial and had gone to the jury under some error of burden shifting, this Court might, you know, might be interested in that. But here we have essentially went to the jury under both burdens and said if you look at it with the burden of going forward placed on Wealth or you look at it the burden going forward placed on the cable operators, the commission found you win either way. So the McDonnell-Douglas standard, which, by the way, is not based on the statute and has never been set forth by precedent as the FCC, was essentially invented for the purposes of this analysis. The McDonnell-Douglas standard wasn't violated, and it couldn't have possibly made any difference on this record. With respect to the testimony of Mr. Burke, let me just say two things quickly. I was surprised to find out that transcripts are not self-authenticating in this circuit. But, in fact, the Orr decision in the Ninth Circuit really says that quite clearly. And so I don't think the judge actually committed errors in a matter of law. But he did all he said in his decision, what the record reflects, was that it would not be used in the context of the cross-examination of another witness. He specifically invited Wealth to try to make a proper showing of putting in a party admission at a later part in a hearing. They did not do that. This is not the place to correct trial error. Same thing with respect to Mr. Jacobson. Mr. Jacobson was the CEO of In Demand. These proceedings go forward with written evidence. There were deadlines for the identification of witnesses and the submission of written testimony. Mr. Jacobson was not identified. Mr. Ash was proffered by the interveners as another executive of In Demand who could talk about Mojo. He was cross-examined. There was never any suggestion during that cross-examination that a point that Wealth wanted to draw out affirmatively could not be drawn out through the cross-examination of Mr. Ash. There was, again, the judge, when he ruled on Mr. Jacobson's testimony, said, if you have a problem, he said, in essence, with Mr. Ash, come back to me and I'll reconsider the Jacobson testimony, the Jacobson subpoena. And there was no request by Wealth TV to renew that. Again, the error was made at trial, its own Wealth, and they failed to follow through, not that it would have made a difference. And I think, again, if I could just make one last point in closing, that the admission that these evidentiary points would not have been outcome determinative are really make the points irrelevant for the purpose of this appeal under the Tomasetti decision and other decisions of the circuit. If these alleged errors are not outcome determinative, they certainly don't provide a basis for reversal, and certainly not on the basis of this record. Roberts. Thank you, Mr. Cohen. Oh, yes. Before you let me just ask Mr. Pash. Could I ask you one more question? So the FCC is currently engaged in another rulemaking proceeding. Just help me with the context of this. In 2011, the commission harshly concluded a proceeding to revise some of its rules related to this area, and it began a subsequent proceeding to address, among other things, the burden of proof issue. And that proceeding is ongoing. It hasn't been finished yet. It has not. The 2011 order is on appeal in the Second Circuit, but this follow-on proceeding is still pending. Okay. And it's focused on this burden of proof question? The one that's still pending. That's one of the primary issues, yes. Okay. Thanks. Thank you. Let me quickly try to hit on, respond to points that Mr. Cohen and Mr. Pash made. With regard to Mr. Cohen's assertion that we've essentially invented burden shifting in this context, that's not so at all. Indeed, in the case that Mr. Cohen litigated on behalf of Time Warner, Masson v. Time Warner, which ultimately was decided by the Fourth Circuit, Time Warner itself had conceded that the three-phase burden shifting in McDonnell Douglas should apply to that case. The only quibble that the parties had in that case was whether it should be a To counter both of my opponent's arguments that burden shifting wouldn't have made a difference, we just simply do not think that there was any meaningful consideration of the differential treatment that was accorded WEALTH TV versus what was accorded the intervener's own affiliated network, Mojo. And as we've discussed quite extensively in our briefing, every single proffered factor that was supposedly applied to WEALTH TV was either not applied to Mojo or was simply inapplicable. Regarding Judge Watford's questions of Mr. Pash and Mr. Cohen regarding the effect of severing out Egan's analysis, I submit that we simply don't know what the FCC would do in the event that that would occur. They relied very heavily on it in its opinion. So even hypothetically, if the target versus actual programming audience, viewing audience were to survive, we simply don't know whether the FCC would have deemed that to have been substantial evidence. Why can't, as Mr. Cohen said, why can't we just evaluate for ourselves whether in the absence of the look-feel testimony, what remains is substantial enough to support the outcome? We think that even if you did do that, Your Honor, given that in 2011 the FCC promulgated program carriage rules that specifically set forth a similarly situated mode of analysis and included a variety of non-exclusive factors such as target audience and so on, we think that it would be most appropriate for this Court to remand so that this case could be adjudicated under the same rules and procedures. That, of course, was not done here. The rules at that time, and let me, if I can quickly conclude my statement. The rules at that time simply didn't have any standards or procedures whatsoever to determine whether networks were similarly situated. They were making, the parties were almost literally making these rules and standards and elements up as they were going along. So we think it would only be appropriate under the APA for a remand to occur so that we can have a new analysis conducted under specifically promulgated notice and comment made rules that would apply to all parties in all carriage disputes. Thank you very much. Thank you, Counsel. We appreciate your arguments and I hope everybody has a safe trip back home. The matter is submitted.
judges: Kobayashi, Paez, Watford